1      UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF ALASKA

3 UNITED STATES OF AMERICA,  ) Case 4:06-cr-00018-TWH
            )
4     Plaintiff,  ) Fairbanks, Alaska
            ) Wednesday, May 31, 2006
5   vs.      ) 8:35 o'clock a.m.
            )
6 DUSTIN ARMSTRONG,    )
            )
7     Defendant.  )
 _____) REVOCATION HEARING

8

9     **TRANSCRIPT OF PROCEEDINGS**

10   BEFORE THE HONORABLE TERRENCE W. HALL
    UNITED STATES MAGISTRATE JUDGE

11
 APPEARANCES:

12

13 For the Plaintiff:  STEPHEN COOPER
         Assistant U.S. Attorney
         U.S. Attorney's Office
14        101 12th Avenue, Room 310
         Fairbanks, Alaska  99701
15        907-456-0245

16 For the Defendant:  M. J. HADEN
         Assistant Federal Public Defender
17        Federal Public Defender's Office
         550 West 7th Avenue, Suite 1600
18        Anchorage, Alaska  99501
         907-646-3400
19
 Probation Officer:  TONI OSTANIK
20        U.S. Probation Service
         101 12th Avenue, Room 322
21        Fairbanks, Alaska  99701
         907-456-0266
22
 Court Recorder:   MADELINE SCHOLL
23        U.S. District Court
         101 12th Avenue, Room 332
24        Anchorage, Alaska  99513-7564
         907-451-5791
25

1  APPEARANCES (Continued):

2  Transcription Service:    GAYLENE'S WORD SERVICES
                             M. Gaylene Larrecou
3                            7330 Madelynne Dr.
                             Anchorage, Alaska  99504-4659
4                            907-338-3936

5

6

7  Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **FAIRBANKS, ALASKA – WEDNESDAY, MAY 31, 2006**

2  (FBXMJ Courtroom)

3  (8:34:48)

4              THE CLERK:  All rise.  His Honor the Court, the U.S.

5  District Court for the District of Alaska is now in session,

6  the Honorable Terrence W. Hall presiding.  Please be seated.

7              THE COURT:  Good morning, ladies and gentlemen.

8              MR. COOPER:  Good morning, Your Honor.

9              MS. HADEN:  Good morning, Your Honor.

10             THE COURT:  We're here today in the case of *United*

11 *States of America versus Dustin L. Armstrong*, Case Number

12 4:06-00018.  Today is the day that's been set for the

13 revocation hearing, and before the Court are motions to

14 dismiss certain allegations, specifically allegations 2, 3, 5,

15 6, and 8, and the opposition filed by the government.  And I

16 am prepared to rule on that motion today.

17             I've had a chance to take a look at *Stevens*, the

18 case that everyone feels is relevant to this particular case,

19 and I've also had a chance to talk to the probation officer,

20 Ms. Ostanik, regarding certain time lines that may have

21 occurred and didn't occur.

22             It seems to me that one of the issues that needs to

23 be addressed early on is whether or not, as set forth in the

24 motion filed by Ms. Haden, is that at some point prior to

25 December the 27th, 2005, Mr. Armstrong's supervision was

1  officially transferred to the District of Alaska.  That is the

2  essence, I think, of what needs to be addressed.  The question

3  is whether or not Mr. Armstrong was on courtesy supervision

4  out of the Middle District of Georgia or whether or not he

5  became an official member of the District of Alaska family of

6  supervised probationers.

7      I've had a chance to talk to Ms. Ostanik, as I've

8  said, and it appears to me that Mr. Armstrong's supervision

9  was not officially transferred to Alaska until sometime time

10  later.  In fact, Ms. Ostanik has informed me that it was only

11  after Mr. Armstrong began violating his terms of release from

12  the Middle District of Georgia that supervision was

13  transferred.  In fact, she's informed me that she called the

14  Middle District of Georgia and asked them to take him back,

15  and it was only after that period of time that the decision

16  was made to officially transfer supervision of Mr. Armstrong

17  to the District of Alaska.

18      MS. HADEN:  Your Honor, for the record, may I be

19  heard?

20      THE COURT:  Well, I'm --

21      MS. HADEN:  On this issue of the information that --

22      THE COURT:  I'm going to give Ms. Ostanik a chance

23  to come up and testify so we've got a record, okay?

24      MS. HADEN:  That's what I'm concerned about, Your

25  Honor, is all of this is --

*Gaylene's Word Services*

*(907) 338-3936*

1            THE COURT:  Ms. Haden, okay, I have a plan --

2            MS. HADEN:  For the record, I object to any

3    information that the Court's using that's not in the official

4    record because I don't have a chance to cross-examine.

5            THE COURT:  Ms. Haden, okay, I have a plan here.

6    Ms. Ostanik is here, she's going to testify, and I just want

7    to give everybody an overview as to where we're at.  That

8    being the case, it seems to me, if Ms. Ostanik's testimony

9    reflects that, that because there was no formal transfer of

10   supervision, then that the conditions as set forth by the

11   Middle District of Georgia are the conditions that need to be

12   applied, and I don't believe *Stevens*, okay, finds fault with

13   that.

14           And so I guess the first order of business is to

15   have Ms. Ostanik come up here and be sworn to testify, and

16   we'll ask a couple of questions and find out whether or not my

17   perceptions are correct or not.

18           THE CLERK:  Please stand before me to be sworn.

19   Please raise your right hand.

20   **TONI MARIE OSTANIK, COURT'S WITNESS, SWORN**

21           THE CLERK:  For the record, please state your full

22   name, address, and spell your last name.

23           THE WITNESS:  Toni Marie Ostanik, O-s-t-a-n-i-k,

24   Fairbanks, Alaska.

25           THE COURT:  I'm going to ask a couple of questions

1  based upon my understanding as to what's happened, and then

2  I'll leave it up to the parties to cross-examine and to

3  develop testimony from that point.

4                    **VOIR DIRE EXAMINATION**

5  BY THE COURT:

6  Q    Ms. Ostanik, what is your job?

7  A    United States Probation Officer.

8  Q    When did you first become aware of Mr. Armstrong?

9  A    In late December, I believe.

10 Q    And why was that?

11 A    I received a call from Colorado that had stated he would

12 be coming up with his parents.

13 Q    Okay.  And take the Court through the sequence of events

14 up to the time that a petition was filed revoking his terms of

15 probation.

16 A    The defendant started being seen by our office, I

17 believe, in January is when we had contact with him.  Could've

18 been late December, January.  He started reporting as

19 directed.  We did not have jurisdiction at that time.  The

20 jurisdiction still remained with the Middle District of

21 Georgia.  We had him -- he came from Colorado after completing

22 a -- after participating in a substance abuse program.  We put

23 him on urinalysis monitoring.  The defendant then began

24 violating.  In early March I wrote to Georgia asking them to

25 take the defendant back, as he had violated in our district

1   and we had no authority in our district to do anything

2   regarding his supervision.  They in turn said since the

3   violations had occurred here, it would be best if we went

4   ahead and took jurisdiction; that initiated the jurisdiction.

5   And I believe by March 29th, Your Honor signed the order for

6   jurisdiction to be transferred from the Middle District of

7   Georgia to the District of Alaska, at which time we filed a

8   petition alleging violation.

9           THE COURT:  Okay.  Now, I know that's kind of

10  sequence in terms of how we're supposed to proceed here, but

11  insomuch as the probation officer actually is part of the

12  judiciary, I wanted to get on the record the conversation that

13  she and I had had regarding the sequence of events involving

14  the issue here as to whether or not the District of Alaska had

15  taken jurisdiction over Mr. Armstrong prior to December the

16  27th.  And so I will open that up for questioning by the

17  parties regarding that line of questioning and anything else

18  that the government or the defense would like to pursue.

19  Mr. Cooper?

20          MR. COOPER:  I don't think I have any questions,

21  unless perhaps something following the defense inquiry.

22          THE COURT:  Very well.

23          MR. COOPER:  Thank you.

24          THE COURT:  Ms. Haden.

25          MS. HADEN:  First of all, Your Honor, I'd like to

*Gaylene's Word Services*
*(907) 338-3936*

Exhibit A
Page 7 of 38

1  see the letter that Ms. Ostanik wrote to the Middle District

2  of Georgia, and I think I'm entitled to that under 2602.

3        (Pause)

4             THE COURT:  We'll make copies for everybody.  I

5  haven't seen this letter, either.

6             MS. HADEN:  May I approach, Your Honor?

7             THE COURT:  Yes, you may.

8             MS. HADEN:  This (indiscernible - away from

9  microphone).

10            MR. COOPER:  I didn't see that.  Thank you.

11            MS. HADEN:  There's --

12            THE COURT:  Would it be helpful to make copies of

13  this right now?

14            MS. HADEN:  It's not necessary to me.

15            MR. COOPER:  Well, I think I'd appreciate having a

16  copy.

17            THE COURT:  Madam Clerk, would you make three

18  copies, please?

19            THE CLERK:  Want me to go off record?

20            THE COURT:  Yes.

21       (Off record at 8:44:42 a.m., until 8:46:44 a.m.)

22            MR. COOPER:  -- testifies when the request was made

23  to transfer jurisdiction.

24            THE COURT:  No, that was a separate document that I

25  think was signed on March the 29th.

OSTANIK - CROSS

1          MR. COOPER:  Okay.

2          THE COURT:  But at any rate, okay -- as far as

3 yours --

4          MS. HADEN:  Can I start my cross --

5          THE COURT:  -- you bet.

6                    **CROSS-EXAMINATION**

7 BY MS. HADEN:

8 Q    Ms. Ostanik, both in the letter that we're talking about,

9 which is the letter from your office to the Northern District

10 of -- excuse me, the Middle District of Georgia, and in your

11 declaration in support of the petition, it refers to a, quote,

12 "letter to transfer supervision" was submitted, is that

13 correct?

14 A    Yes.

15 Q    And that was a letter of transfer from Colorado?

16 A    It formerly came from -- I know we got a phone call

17 from -- we received a letter from the Middle District of

18 Georgia, and we -- I know we received a phone call from the

19 District of Colorado.

20 Q    And that letter was a letter to transfer supervision.

21 A    That's correct.

22 Q    Okay.  And as a U.S. Probation Officer, do you have the

23 option as to whether you're going to accept supervision of

24 someone whose judgment is out of a different jurisdiction?

25 A    That's correct.

1  Q    And also in your capacity as a U.S. Probation Officer, do

2  you have the ability to modify somebody's supervision if you

3  feel it's necessary?

4  A    Through the district in which jurisdiction is held.

5  Q    And that can either be a modification through the court

6  or that can be a modification -- a voluntary modification.

7  A    That's correct.

8  Q    In the current day, people who are being released on

9  supervision on old judgments may have, for lack of a better

10 term, a *Stevens* problem in their judgment, is that correct?

11 A    That's correct, yes.

12 Q    And how is that usually handled by your office?

13 A    Through a modification.

14 Q    And that's usually done through a voluntary modification?

15 A    Usually, yes.

16 Q    And you could've asked for that voluntary modification in

17 order to accept Mr. Armstrong's case into this jurisdiction,

18 is that correct?

19 A    I could have, yes.

20 Q    And you could've refused this case had he not been

21 willing to sign the voluntary modification, is that true?

22 A    That is true.

23 Q    And a voluntary modification would've made his judgment,

24 regardless of whatever jurisdiction it was issued in, in

25 compliance with the.....

```
 1  A    For this circuit, yes, this district, yes.
 2  Q    And that could've been done simply by him signing a
 3  document agreeing to the modification?
 4  A    That's correct.
 5  Q    And that could've been done from here?
 6  A    From -- signed it from here but gone through the court in
 7  the Middle District of Georgia.
 8  Q    Have you ever had a court refuse a voluntary
 9  modification?
10  A    No.
11  Q    And just for the record, when Mr. Armstrong was here in
12  the District of Alaska, he was not participating in any
13  bonafide treatment, is that correct?
14  A    He was not in a treatment program outside the UA's that
15  we have, yes.
16  Q    And again just for the record -- I think we went over
17  this in the last hearing, but just for this record, you
18  don't have any specialized training in substance abuse
19  counseling.
20  A    That's correct.
21       MS. HADEN:  Your Honor, I think that completes my --
22  what I would like have on the record.
23       THE COURT:  Thank you.
24       Mr. Cooper?
25       MR. COOPER:  Thank you, Your Honor.
```

**CROSS-EXAMINATION**

BY MR. COOPER:

Q    Now, as I understand the purpose of this letter--correct me if I'm wrong--was to have the probation officer in Georgia recognize that they have to take him back because he wasn't working out, is that the idea?

A    That's correct, yes.

Q    I mean take him back physically through a violation proceeding in that district?

A    That's correct, have him seen before their court where jurisdiction was held.

Q    Right.  Jurisdiction up to that time never left Georgia, did it?

A    That's correct.

Q    Okay.

A    The Middle District of Georgia.

Q    Right.  And your explanation for what happened is what following this letter?

A    I telephoned Middle District of Georgia following this letter, and they stated that since the violations had occurred here in our district, it might be best if we went ahead and would look at accepting jurisdiction.

Q    Okay.

A    And so we -- that initiated the process of jurisdiction being transferred to the District of Alaska.

OSTANIK - CROSS

1  Q    Now, all the violations that you subsequently listed in

2  your petition before this court in Alaska, are these any

3  different from what you recited to the probation officer in

4  Georgia in this letter of March 3rd that you were asking them

5  to take him back to Georgia to face this?

6  A    I don't believe so.  There may have been one following

7  it, but...

8  Q    Okay.

9  A    No, it looks like all that were listed are in there.

10 Q    Okay.  So the eight -- the violations, we have eight

11 violations in your petition in this district, and they're

12 pretty much the same -- they are the same as what you had

13 listed to the Georgia folks in this letter saying it.

14 A    Yes.  I had outlined the violations.

15 Q    He's yours, this is what he's done, you should deal with

16 it.

17 A    Yes.

18 Q    That's what this letter essentially is.

19 A    Yes.

20      MR. COOPER:  All right.  Your Honor, I would like to

21 have this become an exhibit, the letter of March 3rd.  This is

22 the one we've been talking about up until now that has not

23 been put into evidence, March 3rd, 2006, from the probation

24 officer in this district to the probation officer in the

25 Middle District of Georgia regarding their probationer,

OSTANIK - CROSS

1  Mr. Armstrong.

2          THE COURT:  Any objections to that letter being

3  introduced, Ms. Haden?

4          MS. HADEN:  No, sir.

5          THE COURT:  Very well.  Madam Clerk, you'll mark

6  that as exhibit 1.

7     (Plaintiff's exhibit 6 admitted [as renamed subsequently])

8          THE COURT:  There's a sticker over there.  You got

9  a sticker?  Yeah?

10         MR. COOPER:  We had some exhibits the last time,

11  Your Honor.  Shall we just make this in series?

12         THE COURT:  Madam Clerk -- I think probably we need

13  to continue, you're right.

14         MR. COOPER:  Okay.  I think 4 was about as far as we

15  got -- 5, I'm sorry, was as far as we got last time.

16         THE COURT:  I have exhibit 5 here.  Exhibit 6 seems

17  to be better.

18         MR. COOPER:  So makes that 6, then.

19         THE COURT:  6.

20         MR. COOPER:  So --

21         THE COURT:  Right.

22         MS. HADEN:  I don't have any objection to that, but

23  I do have an objection in that we're now going to consider 1

24  through 5 in this hearing, because they haven't been

25  introduced.

OSTANIK - CROSS

1              THE COURT:  I -- just to make sequence, just to make

2       the record clear, I haven't even read 1 through 5, okay?  I

3       just noticed that in the file here that I've got there's a

4       sticker that says exhibit number 5, and if we make that

5       number 6, that way it's not going to be confusing, so I'll

6       make that exhibit number 6.

7              MR. COOPER:  Well, was it a different judicial

8       officer presiding at the time the other five were admitted?

9              THE COURT:  Yes.  Judge Roberts was here.

10             MR. COOPER:  Oh, I see.  Fine.  Okay, then we

11      offer 6, then, Your Honor.  All right.  Will I hand that up,

12      or everybody has --

13             THE COURT:  I think that Madam Clerk is going to

14      take that and --

15             MR. COOPER:  I'll hold it for a moment here, unless

16      the Court wants to refer to it.  It's the same one that the

17      Court has.

18             THE COURT:  Very well.

19             MR. COOPER:  It now has an exhibit 6 sticker on it.

20             THE COURT:  6 is admitted then.

21             MR. COOPER:  Thank you.

22             THE COURT:  Over no objection.

23             MR. COOPER:  I think that's all the questions I

24      have, Your Honor.

25             THE COURT:  Anything further from that, Ms. Haden?

1              MS. HADEN:  Yes, Your Honor.

2                  **CROSS-EXAMINATION CONTINUED**

3  BY MS. HADEN:

4  Q    Ms. Ostanik, did it surprise you that the North -- that

5  the -- sorry.  I'm from the Middle District of Georgia, that's

6  why it just comes out.  Did it surprise you that the Middle

7  District of Georgia wanted to officially transfer jurisdiction

8  up here in order for a warrant to be issued?

9  A    Did it surprise me?

10 Q    Right.

11 A    No, it didn't.

12 Q    In fact, that's fairly commonplace when the violations

13 take place in one jurisdiction and the defendant is in the

14 jurisdiction in which the violations took place that

15 jurisdiction gets transferred?

16 A    Well, from my experience, but we're also talking -- we're

17 very remote in consideration to other districts, so I think

18 cost sometimes takes into effect [sic].  That -- that's just a

19 opinion of mine.

20 Q    So especially in this -- in the District of Alaska, most

21 of the time the case is transferred.

22 A    Yes.

23 Q    And in particular when it's a misdemeanor case, it might

24 be transferred, is that true?

25 A    The -- the jurisdiction is transferred?

*Gaylene's Word Services*

*(907) 338-3936*

1  Q    Yes.

2  A    If there are violations, yes.

3  Q    To facilitate a revocation hearing.

4  A    That's correct, yes.

5  Q    And usually you don't ask for jurisdiction to be

6  transferred until there is a problem, isn't that correct?

7  A    It -- it's dependent.  I think every officer may be

8  different on how they handle that.

9  Q    But in your experience, you don't ask that jurisdiction

10  be transferred until there is a problem.

11  A    Again, that's not always true.  There may be reason that

12  I believe transfer of jurisdiction needs to happen as soon as

13  a person comes onto our supervision.  It's really dependent on

14  each case.

15  Q    So you had that option.

16  A    Yes.

17       MS. HADEN:  If I could just have one minute, Your

18  Honor.

19       THE COURT:  Sure.

20     (Pause)

21       MS. HADEN:  That's all I have.

22            **VOIR DIRE EXAMINATION CONTINUED**

23  BY THE COURT:

24  Q    I have another question.  One of the issues raised by --

25  A    Uh-huh (affirmative).

1  Q    -- the briefing was whether or not the testing that took

2  place of Mr. Armstrong when he came to Alaska was part of a

3  treatment program.  I believe your testimony in response to

4  Ms. Haden's question was that the treatment program had been

5  completed in Colorado.  My question is whether or not the

6  subsequent testing, the testing that took place in Alaska, was

7  part of a continuation of a treatment program even though the

8  formal classroom kind of treatment had ended.

9  A    I do believe an outpatient component was completed while

10 in Colorado.  I believe testing could be a continuation of

11 that treatment that was part -- that he part -- that the

12 defendant participated in in Colorado.

13 Q    My question is, in your mind, when he was tested, was

14 that part of a continuation of the treatment program in

15 Colorado?

16 A    Yes, it was part of a treatment program.

17         THE COURT:  Anything further from that, Mr. Cooper?

18         MR. COOPER:  Only to observe that that is the point

19 that was made on page three of our -- pages two and three of

20 our memorandum and opposition.

21         THE COURT:  And I don't think that was adequately

22 addressed with respect to the opposition.  Ms. Haden, would

23 you like to follow up on that?

24         MS. HADEN:  Yes.

25 / / /

1                    **CROSS-EXAMINATION CONTINUED**

2    BY MS. HADEN:

3    Q    Who was overseeing that treatment program?

4    A    It was through our office.

5    Q    And is there anybody in your office that is medical

6    staff?

7    A    No.

8    Q    Is there anybody in your office who has a degree that

9    would assist in substance abuse treatment?

10   A    No.

11   Q    Were there any group meetings that Mr. Armstrong

12   participated in?

13   A    No, just in the counseling, you know, in our office just

14   by a probation officer and the defendant but no formal

15   training for that, no.

16   Q    And who decided how often he would take UA's once he came

17   to the District of Alaska?

18   A    We normally determine -- the probation officer is the one

19   who determines how many UA's, and that's determined on type of

20   drug.

21   Q    So there was no one connected with any type of substance

22   abuse program that determined how many UA's he could take.

23   A    That's correct.

24   Q    And there was no guidance from anybody, say, at Ralph

25   Perdue or Pacific Rim that had input into what type of

1  treatment he was receiving here?

2  A     Not with the defendant, no.

3  Q     How often did you meet with the defendant?

4  A     Well, it was usually more often -- anytime he came in for

5  a urinalysis, we usually met with him if there was an issue.

6  I believe he was two or three times a month, and then he'd

7  have to come in for reporting as well.

8  Q     How long would the meetings last?

9  A     Anywhere from five minutes to probably half an hour.

10  Q     In your opinion, were the UA's -- let me back up.  How

11  does then a judgment out of the Ninth Circuit would -- in your

12  opinion, would you say that you were in compliance with

13  *Stevens*?

14  A     No.

15           MS. HADEN:  That's all I have.

16           THE COURT:  Okay.  Mr. Cooper?

17           MR. COOPER:  Nothing further, Your Honor.

18                **VOIR DIRE EXAMINATION CONTINUED**

19  BY THE COURT:

20  Q     As a procedural point, Ms. Ostanik, do you have the

21  authority to file a probation revocation petition without

22  jurisdiction being transferred to the District of Alaska?

23  A     No.  The process -- if jurisdiction still remains with

24  another district, we send a letter that it happen through

25  their district, and they are the ones who then decide and

1  submit it to their court.

2  Q    And so for in order for you to be able to file this

3  petition that you've filed, then jurisdiction would have had

4  to have been transferred then to the District of Alaska, is

5  that correct?

6  A    Jurisdiction, yes.

7  Q    Okay.  And that's the result of what happened after this

8  March 30 -- March 3 letter --

9  A    That --

10  Q    -- was sent, and that initiated the conversation, and at

11  that point they declined, and you accepted, and that's when

12  you filed the petition, is that correct?

13  A    That's correct.

14  Q    Okay.  So the threshold with respect to filing a petition

15  for revocation is that there has to be some acceptance of that

16  responsibility by the District of Alaska in order to subject

17  the defendant.

18  A    To our rules and regulations here, yes.

19          THE COURT:  Great, okay.  All right.  Anything

20  further from that?

21          MR. COOPER:  No, Your Honor.

22          THE COURT:  Ms. Haden?

23          MS. HADEN:  No, sir.

24          THE COURT:  Okay.  Thank you, Ms. Ostanik.  You can

25  be excused.

1      (Witness excused)

2          THE COURT:  I believe that the record is clear at

3  this point that jurisdiction with respect to supervising

4  Mr. Armstrong and applying the mandates of *Stevens* and other

5  conditions of release in the Ninth Circuit or the District of

6  Alaska did not take place until such time as there was a

7  formal application to transfer jurisdiction.  And I believe

8  that exhibit number 6 shows that there was this conversation

9  between the two probation departments as to what to do with

10  Mr. Armstrong.  And apparently Ms. Ostanik's first choice was

11  to send him back to Georgia, from whence he had been

12  sentenced.  When that didn't happen, the jurisdiction was

13  transferred.

14          It's also clear from her testimony that all of the

15  violations set forth in the petition to revoke probation

16  occurred prior to that time that jurisdiction was transferred

17  to Alaska.  Given that fact, it seems to me that the

18  conditions as set forth by the Middle District of Georgia are

19  the conditions of probation that we need to place in context

20  of whether or not Mr. Armstrong has violated his conditions of

21  probation.  That's a long way of saying that I find that

22  jurisdiction did not transfer to Alaska prior to that time

23  that Mr. Armstrong is alleged to have violated the conditions

24  of his probation.  Therefore, it seems to me that the mandates

25  in *Stevens* are not applicable in this particular case.

1  Certainly they would be after jurisdiction was transferred to

2  the District of Alaska.

3          So based upon that, I'm going to deny the defense's

4  motion to dismiss allegations 2, 3, 5, 6, and 8 of the

5  petition to revoke probation as set forth in docket number 10.

6          Mr. Cooper, I believe we now have the probation

7  revocation issue to deal with.

8          MR. COOPER:  Very well.  We've had an evidentiary

9  hearing on that, and I guess at this time the Court is

10 prepared to take evidence of the same -- essentially the same

11 things we had at the preliminary and establish the fact

12 necessary to determine whether revocation is proper, and

13 that's the position we're in.  I need to call the probation

14 officer and go through that.

15         THE COURT:  Pertinent proof at the preliminary

16 hearing was somewhat different than the burden of proof today,

17 as I understand it, so I believe we do need to do that unless

18 there's some agreement by the parties to accept the exhibits

19 or --

20         MR. COOPER:  Well, I'd be willing to -- in fact, I

21 guess I would offer the same exhibits again, but if we need to

22 authenticate those through testimony, we'll do that and go

23 through the whole set of exhibits.

24         MS. HADEN:  Your Honor, I don't have any problem

25 with the exhibits.  I don't think we need to authenticate them

1  again.  I mean, the only purpose for the hearing will be to

2  preserve Mr. Armstrong's appellate rights.

3          THE COURT:  Very well.  So there's an offer, then,

4  to introduce in this proceeding exhibits 1 through 5?

5          MS. HADEN:  I would stipulate to the introduction of

6  1 through 5 at this point.

7          THE COURT:  Very well.  Then exhibits 1 through 5 in

8  the proceedings before Magistrate Judge Roberts, okay, are

9  accepted in this particular case.  Mr. Cooper?

10      (Plaintiff's exhibits 1, 2, 4, and 5 admitted)

11          MR. COOPER:  Very well, then.  I would call

12  Probation Officer Ostanik to the stand to explain those and

13  substantiate each of the allegations.

14          THE COURT:  Very well.  Ms. Ostanik, would you

15  please?  You are sworn in; you remain under oath.

16    **TONI MARIE OSTANIK, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

17                        **DIRECT EXAMINATION**

18  BY MR. COOPER:

19  Q    For the record, Ms. Ostanik, you're the probation officer

20  who was supervising the defendant, Armstrong, as a courtesy

21  for the district -- the Middle District of Georgia during the

22  time of the allegations in the petition to revoke?

23  A    Yes.

24  Q    And do we -- are we dealing with the petition that was

25  signed by the court on the 29th of March, setting forth eight

OSTANIK - DIRECT

1  allegations?  Is that the one?

2  A    Yes, that's correct.

3        MR. COOPER:  And I have here the original five

4  exhibits that we used at the preliminary hearing.  What I'd

5  like to do is I'd like to hand those to the witness, Your

6  Honor, and then have her explain those for us.

7        THE COURT:  Very well.

8  BY MR. COOPER:

9  Q    Let me get them all out here.

10 A    Did you want me to go through --

11 Q    Now -- yes, I'll -- I don't have a copy of those in front

12 of me, but I have here your petition and your declaration in

13 support of petition here.  What I'd like you to do is to take

14 the exhibits and read the number that's on each one and tell

15 me what that is and what allegation that relates to.

16 A    Exhibit 1 is a copy of the -- or it looks like an

17 original of the court judgment from the Washington County,

18 Colorado, in which the defendant pled guilty to driving

19 without a driver's license and received a deferred sentence

20 for underage drinking.

21 Q    And that relates to allegation violation number 1?

22 A    That's correct, yes.

23 Q    And is that a violation of probation?

24 A    Yes.

25 Q    In what respect is it a violation of probation?

1  A    Yes.

2  Q    In what way?

3  A    I'm sorry?

4  Q    In what way is it a violation?

5  A    He committed a new law violation.

6  Q    All right.  And then what is the next exhibit that you

7  have there?

8  A    It's a --

9  Q    Number 2.

10 A    Exhibit number 2 is -- are results of a controlled

11 substance test in which it states that the quantity was not

12 sufficient for urinalysis.

13 Q    And does it also --

14        MR. COOPER:  May I approach and look at that

15 exhibit, Your Honor?

16        THE COURT:  Very well.

17 BY MR. COOPER:

18 Q    Okay.  What does it say is the reason there to -- tell us

19 the complete statement of the reason that they didn't come up

20 with a conclusion.

21 A    The result -- the -- the results of the controlled

22 substance stated "Sample leaked in transit.  Quantity not

23 sufficient for analysis."

24 Q    Okay.  So what -- had there been any preliminary testing

25 on that before you sent it?

1  A    Yes.   A handheld test confirmed -- resulted in a positive

2  reading for marijuana, and thus it's sent -- we then sent off

3  the -- the urine sample to be tested, though it was unable to

4  be tested by the laboratory.

5  Q    And have you previously told us what the percentage

6  reliability of the -- or let me put it this way:  Is there a

7  reliability factor that you can derive from your experience

8  how many of these tests that you've done with the field test

9  kit have proved out to be in accordance with that field test

10  and how many have not proved out to be in accordance with the

11  field test?

12  A    The last time I stated -- I was unsure because I -- we

13  don't keep a marking.  I had stated that it was a handful of

14  times that we had received a negative results confirmed by the

15  laboratory when in fact we had received a positive result.

16  Q    And do you recall what the ratio was?

17  A    I don't, no, because it was only -- it was a best guess.

18  Q    Uh-huh (affirmative).

19        MS. HADEN:  Your Honor, I'm sorry, but I'm going to

20  need to interrupt.  Mr. Cooper, are you trying to prove

21  allegation number 4?

22        MS. HADEN:  I think she said this was number 2.

23  BY MR. COOPER:

24  Q    That -- is this number 2 that you're talking about?

25  A    I'm sorry, no.  Number -- exhibit number 2 has to do with

1  number 4, (indiscernible - simultaneous speech).

2  Q    Oh, okay.

3  A    I'm sorry.

4          MS. HADEN:  Which --

5          MR. COOPER:  But 4 was not found -- we're not

6  dealing with number 4, Your Honor.  I thought she said 2.

7          MS. HADEN:  Right.  It was no probable cause on 4.

8          THE COURT:  Very well.

9          MS. HADEN:  So --

10          MR. COOPER:  So we'll withdraw --

11          MS. HADEN:  All of just this entire line of

12  questioning.

13          MR. COOPER:  We've withdrawn that, Your Honor,

14  because I -- she said it was number 2.  I guess it's

15  actually -- and number 4 was not found sufficient by the

16  magistrate at the preliminary hearing.

17          THE COURT:  Very well.

18  BY MR. COOPER:

19  Q    So number -- exhibit 2 does relate to violation number 4,

20  is that right?

21  A    That's correct.

22  Q    Okay.  So let's set number 2 aside and go on to exhibit

23  number 3.  What is that?

24  A    Number 3 is another result of a controlled substance from

25  the Scientific Testing Laboratories, which showed a positive

1  for hydrocodone, which was confirmed by the GCMS testing.

2  Q    And what allegation does this relate to?

3  A    Allegation number -- this would be allegation number 5.

4  Q    Five.

5  A    Yes.

6  Q    Okay.  And that's exhibit 3.

7  A    That's correct, yes.

8  Q    All right.  And that showed --

9  A    That showed a positive for hydrocodone.

10  Q    And is that an opiate?

11  A    Yes.

12  Q    And that's a violation of one of the conditions?

13  A    Yes.

14  Q    In the judgment.

15  A    That's correct, yes.

16  Q    And that violation occurred approximately when?

17  A    February 2nd, 2006.

18  Q    All right.  And what is exhibit number 4?

19  A    It's a result of a controlled substance by the Scientific

20  Testing Laboratories dated March 2nd, 2006, which showed a

21  positive confirmation by the GCMS testing for THC

22  cannabinoids.

23  Q    All right.  And that was a violation of a judgment

24  condition?

25  A    That's correct, yes.

OSTANIK - DIRECT

1   Q    Was that a test that you took?

2   A    We did a handheld here in our office.

3   Q    All right.

4   A    And then we sent that off to the laboratories to be

5   tested for confirmation.

6   Q    So this relates to allegation number what?

7   A    Number 6.

8   Q    Number 6?

9   A    I'm sorry, no.

10  Q    Number?

11  A    Number 8.

12  Q    Eight, okay.

13  A    Number 8.

14  Q    Okay.  So number -- that's exhibit 4, is it?

15  A    That's correct, yes.

16  Q    Relates to violation allegation number 8.

17  A    Number 8.

18  Q    Okay.

19  A    Also dated March 2nd, 2006.

20  Q    All right.  And then exhibit number 5 is what?

21  A    The defendant signed an admission of drug use on

22  March 2nd, 2006, stating that he had used marijuana

23  approximately two weeks ago at that date.

24  Q    And so that is also allegation number 8?

25  A    That's -- that's correct, yes.

1  Q    All right.  So that's the end of the exhibits there, is

2  that right?

3  A    That's correct, yes.

4  Q    Okay, now, so we've -- your exhibits relate, then, to

5  violations--correct me if I've got it wrong--violation

6  number 1, number 5, and number 8?

7  A    That's correct.

8  Q    Okay.  What can you tell us about number 2 which alleges

9  that on December the 27th, the defendant failed to comply with

10  drug testing?

11  A    I had received a telephone call.  That was a day that he

12  was supposed to come in for a urinalysis.  He called later in

13  the day and stated that he was at the hospital, and I stated I

14  needed proof of that hospital visit, and he did not provide

15  proof of that hospital visit and later said that he had woke

16  up and was scared.

17  Q    So he -- you say later -- in other words, what did he

18  tell you first, that he was in a hospital?

19  A    He first told me that he had -- he was in the hospital.

20  Q    All right.  And when did he tell you that, roughly?  If

21  you have a record, that would be fine.

22  A    It was that day that he had -- on the 27th, he had

23  contacted me that day, that he had -- that he was in the

24  hospital.

25  Q    Uh-huh (affirmative).  And then later you found out what?

1  A    And then later -- several days later, he had been

2  instructed to provide proof of that hospital visit, and he

3  never provided proof of that hospital visit.

4  Q    And the matter was left there, or was -- did he say

5  anything further?

6  A    He did report to me, I believe, later, not on the same

7  day of the urinalysis that he missed, that he was scared and

8  that he had woked up late -- he'd woke -- woken up late and

9  was scared to come in.

10  Q    All right.  And was -- is that the subject of any more

11  than just violation number 2, it's just all included in

12  number 2?

13  A    That's all included in number 2.

14  Q    Okay.  All right.  Then number 3, the defendant shall

15  answer truthfully all inquiries by the probation officer, and

16  that on January 5th he failed to answer truthfully when

17  questioned.  What does that relate to?

18  A    January 5th is when I had a notation that he had come

19  into the office, and that's when he had admitted to the

20  oversleeping and the missed urinalysis.

21  Q    Okay.  So that --

22  A    So he --

23  Q    -- that related back to number 2.

24  A    Two, yes.

25  Q    It was admitting the false statement that he had given

1  you.

2  A    That's correct.

3  Q    All right.  Number 4 was not found supported by a

4  probable cause by the magistrate judge at the previous

5  hearing, and number 5 we've covered already.  So number 6 is

6  another allegation relating to untruthfulness of inquiries by

7  the probation officer, this occurring on February 2nd.  What

8  was that in relation to?

9  A    When the handheld tested positive for opiates, I inquired

10  with him what, if anything, he had taken.  He stated that he

11  had some medication that had been prescribed by a physician

12  for an ankle that he had had surgery on beforehand.  I stated

13  I needed proof of that prescription, and he stated it could be

14  out of date, and I said it doesn't matter, just bring me the

15  pill bottle to see that it was in fact a prescription that you

16  had.  He then -- he failed to bring me any documentation.

17  Later in the month when he reported in, he stated that he did

18  not have any -- his father was at this hear -- at this

19  appointment as well.  He stated that he in fact didn't have a

20  prescription and that he had taken a pill at his work that he

21  had gotten from a co-worker.

22        MR. COOPER:  Very well.  And 7 was found not

23  supported by a probable cause at the preliminary hearing, and

24  8 we've covered already, so that's the extent of our inquiry,

25  Your Honor.

*Gaylene's Word Services*
*(907) 338-3936*

 1              THE COURT:  Very well.  So just the record is clear
 2    here, what we're talking about is violations 1, 2, 3, 5, 6,
 3    and 8 --
 4              MR. COOPER:  Correct.
 5              THE COURT:  -- are now before the Court.  Okay.
 6    Very well.  Ms. Haden?
 7              MS. HADEN:  I have no questions.
 8              THE COURT:  Okay.  I have one question, Ms. Ostanik.
 9    Violation number 2, you indicate here that the reason why
10    there was a violation is because he failed to submit a drug --
11    to submit -- to comply with drug testing as part of the
12    program approved by the Probation Department for substance
13    abuse testing and, if necessary, treatment.  Which was it?
14    Was it substance abuse testing or treatment that was involved
15    in this testing here?
16              THE WITNESS:  It's a treatment program; however,
17    it's the testing component.
18              THE COURT:  Okay.  So both.
19              THE WITNESS:  Yes, I would say so.
20              THE COURT:  Okay.  Anything from that, Mr. Cooper?
21              MR. COOPER:  No, Your Honor.
22              THE COURT:  Ms. Haden?
23              MS. HADEN:  No, sir.
24              THE COURT:  Okay.  Very well.  Anything -- okay.
25    You may step down.

1        (Witness excused)

2              THE COURT:  Mr. Cooper?

3              MR. COOPER:  I think that's all I have, Your Honor,

4    unless the Court wishes argument or has a question or

5    anything.

6              THE COURT:  No.  If you rest, I'm going to give

7    Ms. Haden a chance to see if she wants to present anything in

8    defense.

9              MR. COOPER:  Okay.

10             THE COURT:  Okay.  Ms. Haden?

11             MS. HADEN:  No, sir.

12             THE COURT:  Okay.  Do the parties desire argument?

13             MR. COOPER:  I don't think we need to, Your Honor.

14             THE COURT:  Ms. Haden?

15             MS. HADEN:  No, sir.

16             THE COURT:  Okay.  Thank you.  Okay.  Well, I'm

17   going to find, based upon the evidence, that there has been a

18   violation of the conditions of probation, and I'm going to

19   find that the government has met its burden with respect to a

20   violation for Counts 1, 2, 3, 5, 6, and 8 as set forth in the

21   petition to revoke probation.

22             Now, as I understand it, what we do is have a

23   subsequent hearing with respect to any sanctions that are

24   going to be imposed.  Ms. Ostanik has told me she doesn't need

25   the entire 72 hours -- 72 days that is normally associated

1  with a presentencing report and that she might be able to turn

2  this thing around within 10 days.  So what we're looking at

3  here, I think, is a hearing in a relatively short period of

4  time.

5                THE CLERK:  June 15th is 11 days, Your Honor.

6                THE COURT:  Okay.

7                THE CLERK:  It's a Thursday.

8                THE COURT:  That happens to be a day that I'm going

9  to be here doing CVB's.  Is that something we could schedule

10 for 9:00 a.m. on the 15th of June?  Is that a good date for

11 you, Mr. Cooper?

12               MR. COOPER:  Yes, Your Honor.

13               THE COURT:  Ms. Haden?

14               MR. COOPER:  What day is that, Your Honor?

15               THE COURT:  That's a Thursday.

16               MR. COOPER:  That would be all right.

17               THE COURT:  Are you going to be in town then?

18               MS. HADEN:  Yes, Your Honor, I can be here.

19               THE COURT:  Well, if that's -- if you're just going

20 to make that trip, I don't think there's any rush here, we

21 could do it when you're normally scheduled here to make it a

22 little more convenient to you.  When's the next day that

23 you're scheduled to be up here?

24               MS. HADEN:  Your Honor, I'll be up here on June

25 the 9th.

1    THE COURT:  Well, we're going to be passing each

2  other like ships in the night because I may be down in

3  Anchorage at that point, so I'm not going to be available.

4  Okay.  Are you going to be here on July the 6th, Ms. Haden?

5    MS. HADEN:  Your Honor, I'd like to get this over

6  with prior to that.  My client's in custody.  He's been in

7  custody for over two months now.

8    THE COURT:  Very well.  Okay.  Let's set it for the

9  15th, then, at 9:00, okay, for disposition.  Okay.  Very well,

10  okay, 9:00 a.m., 15 June, in this courtroom for disposition.

11  Anything further, Mr. Cooper?

12    MR. COOPER:  No, Your Honor.

13    THE COURT:  Anything further, Ms. Haden?

14    MS. HADEN:  No, sir.

15    THE COURT:  Anything further from the Probation

16  Department?

17    MS. OSTANIK:  No, Your Honor.

18    THE COURT:  Very well.  Thank you very much, ladies

19  and gentlemen.

20    THE CLERK:  This matter now stands adjourned.  This

21  court stands in recess until 11:00 a.m.

22    (Proceedings concluded at 9:26:43 a.m.)

23

24

25

1
## CERTIFICATE

2    I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
3    entitled matter.

4

5    _____COPY_____AUGUST 10, 2006
M. Gaylene Larrecou, Transcriber          Date
6    United States Court Approved
AAERT Certified #00285
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25